UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

   UNITED STATES OF AMERICA

         -against-

   RONELL WILSON,

               Defendant.

--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**04-CR-1016 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Before the court are Defendant Ronell Wilson's motions to strike for cause Juror #788,

Juror #823, and Juror #1237.  For the reasons set forth below, Wilson's motions to strike Juror

#788 and Juror #823 are DENIED.  Wilson's motion to strike Juror #1237 is GRANTED.

## I.     BACKGROUND[1]

      The court is currently conducting oral voir dire to select a jury that will decide whether

Wilson will be sentenced to death or to life in prison without the possibility of release at an

upcoming penalty phase re-trial scheduled to begin on June 24, 2013.

### A.     Juror #788

      Wilson moves to strike Juror #788 on the ground that for this prospective juror, the issue

of future dangerousness is a dispositive factor such that he is not able to meaningfully engage in

the weighing process set forth in the Federal Death Penalty Act ("FDPA").  The Government

contends that Juror #788 expressed general support for the death penalty in an extreme

hypothetical, and repeatedly expressed an ability to meaningfully consider all forms of

---

[1]     The court will discuss only the background pertinent to the issues addressed in this opinion.  Additional background can be found in the Second Circuit's decision in this case.  See United States v. Whitten, 610 F.3d 168, 173-77 (2d Cir. 2010).

mitigation evidence.

### B.     Juror #823

Wilson argues that Juror #823 "made clear he believed death was the appropriate
sentence in this case," and that to "vote for life, the defense would have to prove that the lesser
punishment was warranted."  (May 12, 2013, Def. Ltr. (Dkt. 1172) at 4.)  According to Wilson,
this prospective juror "is strongly disposed to impose death in a case involving the killing of
police," and "will not adhere to the terms of the [FDPA]."  (Id. at 5; see also May 17, 2013, Def.
Ltr. (Dkt. 1198) at 2 ("Juror 823 has made clear that he is predisposed to impose a death sentence
on Mr. Wilson, based solely on the status of the victims, and he would shift the burden of
proving the appropriateness of a life sentence onto the defense.  This contrary to the terms of the
Federal Death Penalty Act . . . .").)  The Government argues that Juror #823 affirmed his ability
to meaningfully consider mitigation evidence and is able to follow the FDPA's framework.
(May 15, 2013, Gov't Ltr. (Dkt. 1186).)

### C.     Juror #1237

Wilson's motion to strike Juror #1237 is largely predicated on his arguments concerning
Juror #823, maintaining that Juror #1237 cannot follow the FPDA because he believes that there
is a presumption in favor of the death penalty for intentional murder and would require the
defense to prove that a life sentence is appropriate.  The Government argues that Juror #1237
repeatedly stated his ability to consider a life sentence and all proffered mitigation evidence.  In
the Government's view, although Juror #1237 may "lean" toward the death penalty, he is not
unqualified.

## II.   STANDARD OF REVIEW[2]

Given the unusual posture of this case, a legal issue has arisen that requires explication.

Toward the beginning of voir dire, the parties first disputed whether the FDPA sets forth a "presumption" that life in prison without the possibility of release is the appropriate sentence. (See Apr. 23, 2013, Def. Ltr. (Dkt. 1125); Apr. 24, 2014, Gov't Ltr. (Dkt. 1126).) Similarly, the parties now contest whether a prospective juror is unfit to serve if she describes her likely views on the appropriateness of the death penalty after being presented with many detailed facts of this case. Wilson argues that "a juror who enters the penalty hearing without an understanding that the government is required to meet its statutory burdens [set forth in the FDPA] before a sentence of death may be imposed, and would instead need to be convinced by the defendant that a life sentence is deserved, is not qualified to serve." (May 12, 2013, Def. Ltr. at 2.) The Government contests that the FDPA does not establish a presumption in favor of a life sentence, and that a juror who is able to meaningfully consider mitigation evidence and potentially impose a life sentence is qualified. (May 15, 2013, Gov't Ltr. at 4-6.) Additionally, the Government argues that "[g]iven the manner in which Wilson's crimes and convictions have been explicitly described in the questionnaire and in court, it is not surprising that prospective jurors, not having heard a modicum of mitigation evidence, enter the *voir dire* process favoring the death penalty." (Id. at 10.)

To adequately address the issue, some background on the FDPA is required.

Once a defendant has been convicted of a death-eligible crime, the Government must first prove the existence of a "statutory intent element" (sometimes referred to as a "threshold culpability factor"). As relevant here, the Government must prove beyond a reasonable doubt

_____

[2]    In addition to the Standard of Review detailed below, the court incorporates the principles of law it has set forth in previous opinions. (See, e.g., May 9, 2013, Mem. & Order (Dkt. 1168).)

that Wilson:

> (A) intentionally killed the victim;

> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a result of the act; or

> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2); see also United States v. Fell, 531 F.3d 197, 216 (2d Cir. 2008) ("Under the FDPA, a defendant is eligible for the death penalty if the jury finds the charged homicide, a statutory intent element or threshold mental culpability factor under § 3591(a)(2), and at least one of the statutory aggravating factors . . . .").

Next, the Government must prove the existence of at least one of the statutory aggravating factors identified in 18 U.S.C. § 3592(c) beyond a reasonable doubt. As relevant here—and as noticed by the Government (see Notice of Intent to Seek the Death Penalty (Dkt. 174))—these are:

> (8) **Pecuniary Gain**.—The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value[; and]

> (16) **Multiple killings or attempted killings**.—The defendant intentionally killed or attempted to kill more than one person in a single criminal episode.

18 U.S.C. § 3592(c). If the Government fails to establish the existence of a statutory aggravating factor, "the court shall impose a sentence other than death authorized by law." Id. § 3593(d).

If a statutory aggravating factor is proven, the Government may seek to establish other

aggravating factors, including those not identified by statute.  See 18 U.S.C. §§ 3592(c) ("The

jury . . . may consider whether any other aggravating factor for which notice has been given

exists."); 3593(e).  Here, these are:

(1)  **Status of the Victims** — The defendant murdered two law enforcement
officers during the course of their official duties.

(2)  **Contemporaneous Convictions** — The defendant faces contemporaneous
convictions for other serious acts of violence.

(3)  **Future Dangerousness of the Defendant** — The defendant represents a
continuing danger to the lives and safety of other persons.  The defendant is likely
to commit criminal acts of violence in the future that would constitute a
continuing and serious threat to the lives and safety of others, as evidenced by, at
least, one or more of the following:

(a)  Continuing Pattern of Violence . . . ;

(b)  Lack of Remorse . . . ;

(c)  Low Rehabilitative Potential . . . ;

(d)  Membership in a Criminal Street Gang . . . .

(4)  **Victim Impact Evidence** — As reflected by the victims' personal
characteristics as human beings and the impact of the offenses on the victims and
the victims' families, the defendant caused loss, injury, and harm to the victims
and the victims' families, see Payne v. Tennessee, 501 U.S. 808, 825-27 (1991),
including, but not limited to, the following:

(a)  Characteristics of the Victims . . . ;

(b)  Impact of the Offense on the Families of the Victims . . . ;

(c)  Impact of the Offense on the Employer and
Colleagues of the Victims . . . .

(Notice of Intent to Seek the Death Penalty at 3-6.)  The defendant may also seek to prove the

existence of mitigating factors by a preponderance of the evidence, but is under no obligation to

do so.  See 18 U.S.C. § 3593(c).

Once the jury has found the existence (or lack thereof) of the mitigating and aggravating

factors, it must then decide whether: (1) "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death"; or (2) "in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."[3] Id. Thus, as Wilson notes (see May 12, 2013, Def. Ltr. at 2), a capital defendant may only be put to death if the proven aggravating factors carry sufficient weight to justify the death penalty, whether or not mitigation factors are established.[4]

Given this statutory landscape, Wilson now argues that a juror "who enters the penalty hearing without an understanding that the government is required to meet its statutory burdens before a sentence of death may be imposed, and would instead need to be convinced by the defendant that a life sentence is deserved, is not qualified to serve." (Id.) Although he recognizes the unique procedural posture of this case, and the dearth of case law addressing the issue, Wilson maintains (and the Government does not contest (see May 15, 2013, Gov't Ltr. at 9)) that the same standards apply to all capital cases because in the typical case a potential juror is instructed to *assume* that the defendant has been found guilty of the death-eligible crime, whereas here, the venire is instructed that this is actually the case. (May 12, 2013, Def. Ltr. at 3-4.)

What Wilson fails to recognize, however, is that this case is unusual not only because of its procedural posture. Here, the parties drafted and submitted to the court a questionnaire that conveys to prospective jurors a tremendous amount of detail about the facts of the case. For

---

[3]     Although not in dispute here, it must also be proven that the defendant was eighteen years old at the time of the crime. 18 U.S.C. § 3591(b) ("[N]o person may be sentenced to death who was less than 18 years of age at the time of the offense.").

[4]     The court need not decide at this time whether the FDPA *requires* a jury to impose a death sentence if it believes that the aggravating factors sufficiently outweigh the mitigating factors, or whether there is a presumption in favor of a life sentence. (See May 15, 2013, Gov't Ltr. at 7-10; May 12, 2013, Def. Ltr. at 2.) As explained below, the court is conducting voir dire, not charging the jury.

instance, page two of the questionnaire states: "In March of 2003, Ronell Wilson killed NYPD Police Detective James V. Nemorin and NYPD Police Detective Rodney J. Andrews. The police officers were working undercover when they were shot in the back of the head while seated in the front seats of a car during a gun sale." (Questionnaire (Dkt. 1051) at 2; see also id. at 6 ("In March of 2003, Ronell Wilson killed two NYPD Police Detectives—James V. Nemorin and Rodney J. Andrews. The police officers were working undercover when they were shot in the back of the head while seated in the front seats during a gun sale in Staten Island."); id. at 10 ("Ronell Wilson is guilty of the intentional murders of NYPD Police Detectives James V. Nemorin and Rodney J. Andrews. **The question of Ronell Wilson's guilt is not in dispute. Ronell Wilson is guilty of intentional and premeditated capital murder of two police officers**. He was not insane, defending himself or acting under the heat of passion at the time of the murders." (emphasis in original)). Also, with the parties' consent (and input), the court informs each panel of prospective jurors at voir dire that "the Defendant, Ronell Wilson, has already been found guilty of killing Detectives James V. Nemorin and Rodney J. Andrews of the New York Police Department in March 2003." (Final Introductory Remarks (Dkt. 1107).)

This level of detail means not only that the parties agree that Wilson is guilty of intentional murder (which must, of course, be presented to prospective jurors), but also the venire is informed of the existence of: (1) four threshold culpability factors, see 18 U.S.C. § 3591(a)(2); (2) the "multiple killings" statutory aggravating factor, see id. § 3592(c)(16); and (3) the "status of the victims" non-statutory aggravating factor (see Notice of Intent to Seek the Death Penalty ¶C(1)). Additionally, often at Wilson's request, the court asks prospective jurors about their views if yet another statutory aggravating factor—future dangerousness—is assumed proven. Viewed through the FDPA's framework, then, the prospective jurors have been

instructed that Wilson is eligible for the death penalty (because the Government has proven a statutory intent element and a statutory aggravating factor) and that (at least) two aggravating factors exist.

With this in mind, it is clear that Wilson's argument fails. He claims that because some jurors (including Juror #823) have indicated that they would "need to be convinced by the defendant that a life sentence is deserved," they are *necessarily* unqualified. In Wilson's view, a prospective juror is unqualified if he expresses his likely views on the case without having been informed of the Government's burdens under the FDPA. This is premature and essentially amounts to a request that the court instruct the prospective jurors as to the specific workings of the FDPA *at voir dire*. But the purpose of voir dire is to determine whether prospective jurors can follow the charge that will be given at the *close* of trial. See United States v. Thomas, 116 F.3d 606, 616-17 (2d Cir. 1997) ("[O]ne of the principal purposes of voir dire is to ensure that the jurors ultimately selected for service are unbiased and willing and able to apply the law as instructed by the court to the evidence presented by the parties.").

The fact that some jurors have expressed certain views about the likelihood they would impose the death penalty given particular factual circumstances does not mean, ipso facto, that they cannot follow the court's instructions delineating the FDPA's weighing process. If their answers, taken as a whole, demonstrate they are able to engage in the constitutionally- and statutorily-required weighing process, an indication that they may initially lean toward one penalty or the other is not inherently disqualifying. In other words, a juror's view regarding the appropriateness of the death penalty under a variety of facts and hypotheticals does not mean that she necessarily is unable to adhere to the court's instructions, so long as the juror is open to meaningfully considering other evidence and has not foreclosed the possibility of imposing a life

sentence.  See 18 U.S.C. § 3593(c); Morgan v. Illinois, 504 U.S. 719, 728 (1992).

Not only are such answers not necessarily disqualifying, a juror's tendency to vote for the death penalty under the facts and hypotheticals presented actually comports with the FPDA, which further assures the court that such jurors can engage in the proper weighing process.[5]  By consenting to the use of an extremely detailed questionnaire, Wilson has elected to present the jurors with a set of facts in which he is already eligible for the death penalty.  Comments concerning a prospective juror's belief she is likely to vote for the death penalty in such circumstances unless persuaded otherwise simply means that she considers the uncontested aggravating factors sufficiently weighty to impose the death penalty, even if Wilson proffers no mitigation evidence, see 18 U.S.C. § 3593(e) (requiring that "in the absence of a mitigating factor," the jury decide "whether the aggravating factor or factors alone are sufficient to justify a sentence of death").  Such views may—but do not necessarily—mean that any established mitigating factors are unlikely to dispel this juror's view that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors founds to exist to justify a sentence of death," id.  But any such view certainly does not mean that the prospective juror would foreclose the consideration of any mitigation evidence, or that she could not engage in the weighing process outlined by the FDPA.  Jurors such as #823 have simply attempted to inform the parties of the likely weight they would attribute to particular factors, given the uncontested facts and, in some cases, various additional hypotheticals.

Wilson's argument might be more persuasive if he had decided to present the prospective

---

[5]     Determining whether jurors are able to do just that has been the court's objective during the entire jury selection process, and every prospective juror that has been (and will be) qualified is able to apply the FDPA's framework according to the court's instructions.

jurors with less detailed information.[6]  Wilson could certainly have sought to inform prospective

jurors *only* that he had been convicted of murder (or carjacking resulting in death) and not

presented the number of murders, the nature of the victims' employment, or the specifics of the

crime.  Wilson also could have avoided raising to the jurors the possibility that the Government

might prove that he is a future danger.  If so, they would not have been told of the existence of

each of the threshold culpability factors; one statutory aggravating factor; and one or more

additional non-statutory aggravating factors.  In such a case, a juror who expressed serious doubt

about imposing a life sentence unless persuaded otherwise might not be able to follow the court's

instructions that set forth the FPDA's weighing scheme.[7]

Here, however, a prospective juror is not unqualified solely because she opines on the

likely weight she would attribute to the mitigating and aggravating factors so long as she is open

to considering both possible penalties and is able to appropriately weigh the aggravating and

mitigating factors.  This comports with the FDPA's statutory scheme and gives the court

confidence that such a juror can actually follow the court's instructions and properly weigh the

statutory and mitigating factors at the close of trial.  Although such a juror may likely vote for

the death penalty absent powerful mitigation evidence, she has not foreclosed the possibility of

---

[6]     Of course, Wilson's decision to present the prospective jurors with detailed facts on the case has identified unqualified jurors who might not have been detected by a questionnaire that only referenced Wilson's conviction for murder.  For instance, the court has struck jurors who indicated that they would always vote for the death penalty for the intentional murder of two police officers or would refuse to consider evidence of Wilson's childhood experiences.

[7]     Notably, the Fourth Circuit upheld a trial court's qualification of a juror who expressed a great likelihood of imposing the death penalty in *all* cases involving intentional murder, not just those where the parties had stipulated to the existence of threshold culpability factors and aggravating factors.  In United States v. Fulks, 454 F.3d 410 (4th Cir. 2006), the district court denied the defendant's motion to strike a juror who stated that although "circumstances presented about the defendant's life and background, unrelated to the offense," were "relevant" to his punishment decision, he would vote for the death penalty "90 percent of the time [in the case of intentional murder], I mean unless its [sic] something outrageous."  Id. at 428.  The court reasoned that "Morgan only requires the exclusion of jurors who would categorically reject any mitigating evidence offered by the defendant," for "although a juror must be willing and able to consider mitigating evidence, he is entitled to '*determine the weight to be given*' to any such evidence."  Id.  (quoting Eddings v. Oklahoma, 455 U.S. 104, 115 (1982)) (emphasis added)).

meaningfully considering such evidence or imposing a life sentence.[8] See Fulks, 454 F.3d at 428.

Of course, if a particular juror expresses such strong feelings regarding the death penalty that the court believes, as a factual matter, he is substantially impaired and cannot follow the court's instructions given at the close of trial that delineate the FPDA's scheme, the court will not hesitate to strike him for cause.[9] Such factual determinations, however, may not be conclusively determined because of a likely view.[10]

\*          \*          \*

This case is unique not only because the jury will soon be asked to decide solely whether Wilson should be sentenced to death or to life in prison without the possibility of release but also because the parties have elected to present prospective jurors with numerous facts and hypotheticals that necessarily imply the existence of (1) a threshold culpability factor; (2) a statutory aggravating factor; and (3) one or more non-statutory aggravating factors. That particular jurors have expressed their likely views given these facts—views that are entirely consistent with the FDPA—does not mean that they necessarily cannot follow the court's

---

[8]      Indeed, to ensure that qualified jurors are able to follow the court's instructions regarding the FDPA, the court has required that no matter the particular factual circumstance, they be able to meaningfully consider mitigation evidence, including Wilson's childhood experiences. (Cf. May 8, 2013, Mem. & Order (Dkt. 1165) at 7 ("The court is convinced that Juror #592 would not *exclude* such evidence from his consideration or automatically impose the death penalty in any given circumstance." (emphasis in original)).

[9]      For this reason, Wilson's citations to this court's decisions in United States v. Basciano are misplaced. There, the court ruled that based upon the record *as a whole,* particular jurors were substantially impaired and unable to follow the FDPA. It did not hold that jurors who indicated likely views in the face of substantial detail are necessarily unqualified.

[10]      If taken to its logical conclusion, Wilson's argument implies that any juror who initially believes that a life sentence is more severe than the death penalty—a belief this court has termed "penalty inversion"—cannot serve because her thoughts conflict with the FDPA. Nearly every juror who has expressed such a view, however, has also indicated that she could put aside such beliefs and follow the court's instructions, which will state that the death penalty is the more severe punishment. Wilson has never objected to the qualification of such jurors. Although the court may have been more explicit in asking whether those jurors could put aside their views on penalty inversion and follow the court's instructions, it similarly believes that every juror qualified thus far has demonstrated her ability to do so with regard to the FDPA's weighing scheme.

instructions concerning the weighing process.  Simply put, Wilson has attempted to discern these jurors' likely views given a litany of stipulated facts and requested hypotheticals; he cannot now challenge for cause those who indicate they will likely not vote in his favor in such circumstances.

## III.    DISCUSSION

With these legal principles in mind, the court turns to Wilson's challenges to three specific prospective jurors.

### A.    Juror #788

Wilson moves to strike Juror #788 for cause.  That motion is denied.

Based upon Juror #788's demeanor at voir dire, the court is convinced that he is a thoughtful, open-minded, and sincere person.  This determination is exemplified by his repeated statements evincing his ability to meaningfully consider mitigation evidence despite his belief that he would perhaps favor the death penalty in the circumstances presented here.  For instance, when asked whether he "would be able to consider evidence about, for example, the defendant's background, upbringing, family, and personal characteristics," Juror #788 replied, "It would have to be persuasive.  I could.  But, you know, without hearing the argument I don't—but I could be."  (May 8, 2013, Hr'g Tr. at 1719:16-23.)  The court then explained the role of a judge in sentencing defendants convicted of non-capital crimes, and asked Juror #788 whether he is "open to seriously consider[ing] evidence of mitigating circumstances in connection with making the evaluation of what the sentence should be."  (Id. at 1719:24-1720:23.)  Juror #788 answered, "I understand.  Yes, I am."  (Id. at 1720:24.)  Moreover, when asked what forms of mitigation evidence about the Wilson's background he would like to know, Juror #788 stated that he "would like to know his home environment, you know, how he was raised.  I know that he was

in a gang, because they've told us, I believe, a little bit about that. You know, some of that background. How he got involved. You know, his influences. Anything that would lead to a lifestyle that he was involved in." (Id. at 1720:6-14.)

Consistent with these responses, Juror #788 affirmed at voir dire that after having heard all of the aggravating and mitigating factors, if he "felt that the mitigating factors were sufficient to justify a life sentence," he could vote for life in prison. (Id. at 1720:15-21.) Similarly, when asked about his questionnaire response in which he indicated that "the punishment should fit the crime" (Questionnaire Response #41), Juror #788 openly and honestly stated:

> Well, from my previous answer to the question, I would lean more towards the death penalty in a case like this. So I do believe the punishment should fit the crime, in that you took the lives of two innocent people, you should have—you know, similar should happen to you. *But that doesn't mean that I wouldn't take into consideration other circumstances that we just discussed, someone's background.* But that's what I mean by that.

(May 8, 2013, Hr'g Tr. at 1722:12-19 (emphasis added).) When asked how his penalty decision would be affected if Wilson were proven to have known that his victims were law enforcement at the time of the murders, Juror #788 stated that he would "lean towards the death penalty in that case," but also assured the court that he would "give meaningful consideration to the mitigating factors before reaching a final decision." (Id. at 1723:2-13.) And when asked about his belief in "an eye for an eye," this prospective juror replied, "I wouldn't have an issue with the death penalty," but on his own added, "like I said before, it doesn't mean I wouldn't take into account other, you know, background information." (Id. at 1723:14-1724:8.)

Juror #788's questionnaire also reinforces the court's opinion that he could meaningfully consider all mitigation evidence no matter the factual context. For instance, Juror #788 wrote that he believes that childhood experiences play a "large role" in a person's behavior and choices as an adult, which is not inconsistent with his view that such experiences do not "excuse the

murder of two innocent people."  (Questionnaire Response #46(a); <u>see also</u> <u>id.</u> #69 (stating that growing up in a high-crime community "has a lot to do with a person[']s behavior as an adult").) He also affirmed that such evidence should be considered in making the punishment decision. (<u>Id.</u> #46(b).)

Wilson's lone basis for striking this potential juror concerns his beliefs about the appropriate sentence if Wilson is proven to be a future danger.  In his questionnaire, Juror #788 was asked whether he would be "unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant presented a future danger to others." (Questionnaire Response #44.)  He checked the "No" box, writing, "I think that is the sole purpose of the death penalty.  If the defendant is a future risk to others I would support the death penalty."  (<u>Id.</u>)  The court then asked Juror #788 about this answer:

> THE COURT:  . . . You answered:  "No.  I think that—I think that is the sole purpose of the death penalty."
>
> PROSPECTIVE JUROR:  Could you repeat the question, I missed—
>
> THE COURT:  Yeah.  Well, let me do it.  It's not a terribly well written question.
>
> "Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant presented a future danger to others?"
>
> And you said:  "No. I think that is the sole purpose of the death penalty.  If the defendant is a future risk to others, I would support the death penalty."
> Now, is that your view?
>
> PROSPECTIVE JUROR:  If he's a risk to others and there's a possibility that he's going to commit a similar crime, yes.
>
> THE COURT:  Would you always impose the death penalty, notwithstanding other factors that you have been asked to consider, if he's a future danger?
>
> PROSPECTIVE JUROR:  Yeah.  If he's going to live his life and he doesn't learn his lesson, he's a future danger, he doesn't show any remorse and his actions since then, yeah, that's—I would—the death penalty would be the verdict that I

would choose for a person like that.

(May 8, 2013, Hr'g Tr. at 1724:19-1725:18.)  Wilson argues that this colloquy alone disqualifies Juror #788.  He is mistaken.

The court does not contest that any juror who could not meaningfully engage in the weighing process set forth in the Federal Death Penalty Act is unqualified.  It also agrees that if any one fact is dispositive of his punishment decision—necessarily implying that all other forms of evidence are irrelevant and therefore would not be considered or weighed—that juror cannot serve.  But as a factual matter, the court believes that Juror #788 could engage in the weighing process and that no one issue necessarily decides the case in his mind.

The court believes that Juror #788 was confused by this particular question, which is reasonable since it is hyper-specific and requires a layman to engage in multiple levels of contingent speculation.  In his questionnaire, Juror #788 checked "No" when asked whether he would always impose the death penalty if Wilson were proven to be a future danger, but stated general "support for the death penalty" in such circumstances.  (Questionnaire Response #44.) At voir dire, he was confused when the court first read this question.  (See May 8, 2013, Hr'g Tr. at 1724:21-25.)  And when he did try to explain his views, Juror #788 still appeared confused, tentatively stating, "Yeah," followed by certain qualifying language.  (Id. at 1725:14-18.)  These few responses do not indicate that he would foreclose all mitigation evidence from his consideration if it were established that Wilson is a future danger, particularly in light of his repeated, confident, and credible answers indicating that he would be open to meaningfully consider all forms of mitigation evidence.  (See id. at 1719:16-23, 1719:24-1720:24, 1720:6-14; see also 1720:15-21, 1722:12-19, 1723:2-1724:8; Questionnaire Response #46(a), (b).)  Rather, the court is firmly convinced that, at most, Juror #788 might place significant weight on the

future dangerousness factor[11]; he would not, under any particular factual circumstance, exclude mitigation evidence (or the possibility of imposing a life sentence) from his consideration. Regarding future danger, Juror #788 merely indicated that this non-statutory aggravating factor would be significant to him, as presented in an extreme hypothetical. Accordingly, Wilson's motion is denied.

### B. Juror #823

Wilson moves to strike Juror #823 for cause. That motion is denied.

As a factual matter, the court finds that although Juror #823 has indicated the likely weight he would apply to certain aggravating factors, he is not substantially impaired and could properly follow the court's instructions concerning the FDPA's framework. At the beginning of voir dire, the court asked Juror #823 about his questionnaire response that indicated that the "death penalty should be administered for premeditated capital murder, especially when it involves the murder of two police officers." (May 9, 2013, Hr'g Tr. at 1792:10-20; see also Questionnaire Response #38, #39.) Juror #823 affirmed this was his view, but explained, "Well, I am for it in this case; however, I would welcome further evidence to see exactly what was happening in the case. It could—it doesn't mean I'm totally for it. I would be open to the life sentence as well without the possibility of parole." (May 9, 2013, Hr'g Tr. at 1792:21-1793:4.) Similarly, although Juror #823 first indicated that he would "always" impose the death penalty if Wilson knew that his victims were police officers, he immediately clarified that he "would always regard the mitigating circumstances because I just wouldn't be that totally hard lined. If the mitigating circumstances led me to believe differently, I could probably go the other way."

---

[11]     Notably, Juror #788 was under the belief that, in the hypothetical posed to him, the future dangerousness aggravating factor was proven to a substantial degree. (See May 8, 2013, Hr'g Tr. at 1725:8-10 ("If he's a risk to others and there's a possibility that he's going to commit a similar crime, yes.").) In other words, under the facts presented, Wilson was proven not just to be a danger, but to be capable of again killing two innocent people.

(Id. at 1803:9-23.)

Juror #823 also affirmed his ability to impose a life sentence after having considered the mitigation evidence. (See id. at 1794:21-1795:5 ("THE COURT: . . . And if you determined that the mitigating evidence was such that the defendant deserves a sentence of life in prison without the possibility of release, could you vote for life in prison? PROSPECTIVE JUROR: Most likely, yes. THE COURT: You said most likely. I'm asking if you decided that these mitigating factors were such that he should get a life sentence, could you vote for a life sentence? PROSPECTIVE JUROR: Yes, I could."); see also Questionnaire Response #54, #55; May 9, 2013, Hr'g Tr. at 1795:11-19 (stating that if he were the only juror who believed that a life sentence was appropriate, he would "stick with that decision").)

This prospective juror repeatedly confirmed his ability to "meaningfully consider" mitigation evidence, including evidence of Wilson's background and upbringing. (See, e.g., id. at 1794:2-7 ("THE COURT: . . . So my question is: With regard to the mitigating evidence, could you meaningfully consider evidence of the type that I just described and other mitigating evidence before deciding what penalty should be imposed on the defendant? PROSPECTIVE JUROR: Absolutely.").) When the court asked Juror #823 whether there is "any kind of mitigating evidence that [he] think[s] would be of interest," he replied, "I would be interested to know how Mr. Ronell was brought up. How he was treated as a child[, i.e. t]reated in his family life. I mean, did he—did he suffer any type of abuse or was he from a broken home or—I would definite—as a parent myself, I mean, I would like to know what goes on. You know, my paternal instinct would definitely kick in." (Id. at 1794:8-19; see also Questionnaire Response #46(b) (affirming that childhood experiences should be taken into consideration, noting, "childhood experiences play a major role[] and should be highly considered").)

Despite these answers, Wilson challenges Juror #823 because he initially indicated that he would categorically impose the death penalty and that he would always impose the death penalty for the intentional killing of an individual who was in fact a police officer. (See May 9, 2013, Hr'g Tr. at 1802:12-1803:3.) But as explained above, Juror #823 immediately clarified that he is still capable of imposing a life sentence and meaningfully considering mitigation evidence no matter the factual circumstances. (See, e.g., id. at 1794:21-1795:5, 1803:9-23.) Ultimately, Wilson's challenge rests on the assertion that because Juror #823 preliminarily stated that he would lean in favor of the death penalty given the specific facts presented—which, through the lens of the FDPA, establishes the existence of all four threshold culpability factors, one statutory aggravating factor, and one non-statutory aggravating factor—he is "unable to fairly consider" the punishment decision and "would shift the burden to the defense to dissuade him." (May 12, 2013, Def. Ltr. at 5.) As explained above, however, these feelings alone do not mean that he cannot follow the court's instructions regarding the proper FDPA balancing scheme. To the contrary, as a factual matter, the court found Juror #823 to be a thoughtful, intelligent, open-minded person who is eminently capable of following the FDPA. He has expressed an ability to meaningfully consider mitigation evidence and has assured the court that he could impose a life sentence based on the appropriate balancing of aggravating and mitigating evidence. Wilson's motion is therefore denied.

### C. Juror #1237

Wilson moves to strike Juror #1237 for cause. This motion is granted.

As both parties acknowledge, Juror #1237 believes that based upon the facts presented thus far, he is likely to vote for a death sentence. In his questionnaire and at voir dire, Juror #1237 repeatedly stated that he thought the death penalty is the appropriate penalty unless proven

otherwise. (See, e.g., Questionnaire Response #39 (explaining his "6" out of "7" to mean that "I believe if a person takes a life and is tried and found guilty he/she get[s] the death penalty; however, only after all the appeals are done and concluded"); id. #41 ("It would depend on the mitigating factors in the case to warrant life in prison."); cf. May 17, 2013, Hr'g Tr. at 2619:16-21 ("THE COURT: Now, if you concluded, after hearing the evidence of mitigation and the evidence of aggravation, that the appropriate sentence that the *evidence justified* was a life sentence without the possibility of release, could you vote for that sentence for intentional murder? THE PROSPECTIVE JUROR: Absolutely." (emphasis added).)

Recognizing that Juror #1237 might not be able to follow the FDPA's framework, the court asked whether he would impose a life sentence "but for finding the aggravating factors to be so great that the death sentence was necessitated." (May 17, 2013, Hr'g Tr. at 2621:11-14.) Juror #1237 stated that he could. (See id. at 2621:15-20.) After this exchange, however, Juror #1237 repeatedly stated that he would require Wilson to prove that a life sentence was justified. (See, e.g., id. at 2624:14-20 ("THE COURT: So, you would start from the presumption that the death penalty is the appropriate sentence? THE PROSPECTIVE JUROR: Knowing the facts as I know them, what was presented to me, that I know about the case . . . from what you are telling me, on the surface, yes.").) Unlike Juror #788 and Juror #823, Juror #1237 was informed that he must impose a life sentence "but for" the existence of significant aggravating factors, but remained firmly convinced that a death sentence is presumptively appropriate.

What also distinguishes Juror #1237 from qualified jurors is his belief that *any* defendant convicted of intentional murder must prove that a life sentence is appropriate. (See id. at 2624:21-2625:13 ("THE COURT: Are there any kinds of intentional murder situations that are more appropriate than others for the imposition of the death penalty, in your opinion? THE

PROSPECTIVE JUROR:  I think, again, I would have to go back to, you know, what the defense would present to change my mind about intentional murder.  THE COURT:  What do you mean to change your mind?  THE PROSPECTIVE JUROR:  Well, it's hard. . . . I mean, on the surface, if somebody intentionally murders somebody and *not knowing anything else*, you know, yeah, he deserves the death penalty . . . ." (emphasis added).)  In other words, Juror #1237 was not merely responding to the facts and aggravating factors presented, but expressing his strong belief in the death penalty in the case of *all* intentional murders.  Given how forcefully these answers were given, the court firmly believes that despite his claimed ability to consider a life sentence and mitigating evidence, Juror #1237 would not be able to follow the court's instructions concerning the FDPA.

Juror #1237 reveals that the parties' dispute detailed in their written submissions cannot be resolved by reference to a particular answer.  Each prospective juror's entire record must be evaluated to determine whether she can follow the FDPA's scheme as instructed at the close of trial.  A juror's likely view after having been presented with the circumstances of the case and various hypotheticals does not end the inquiry.  But Juror #1237 indicated his strong support for the death penalty (1) *after* the court indicated that a life sentence must be given "but for" significant aggravating factors; and (2) *regardless* of the particular facts.  Thus, unlike that concerning Juror #823, the record surrounding Juror #1237 gives the court no confidence that he could follow the instructions detailing the FDPA.  Wilson's motion is therefore granted.

**IV.      CONCLUSION**

Wilson's motions to strike Juror #788 and Juror #823 for cause are DENIED.  His motion

to strike Juror #1237 for cause is GRANTED.

SO ORDERED.

<table>
<tr><td></td><td>    /s/ Nicholas G. Garaufis   </td></tr>
<tr><td>Dated: Brooklyn, New York</td><td>NICHOLAS G. GARAUFIS</td></tr>
<tr><td>       May 24, 2013</td><td>United States District Judge</td></tr>
</table>